CLEMONS, Administrator, Appellant, vs. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY, Respondent.

*December 17, 1908—January 5, 1909.*

*Railroads: Injuries at crossings: Duty of traveler: Diversion of attention: Looking and listening: Excuses: Appeal and error: Review: Findings, when disturbed: Contributory negligence: Statutes.*

1. Mere diversion of attention will not justify failure of a person about to cross a railroad track upon a highway to seasonably look and listen to discover presence in dangerous proximity of an approaching train. Failure to see such train and keep out of its pathway, when there is opportunity for doing so, is only excusable where attention is irresistibly forced to something else.

2. The conclusion of a trial court respecting sufficiency of evidence as to an issue of fact to require its solution by the jury should

not be disturbed upon appeal unless it appears, clearly, that such conclusion was wrong, giving due weight to the superior advantages of the trial court for understanding the situation.

3. The presence of a railway track is such an admonition of probability of danger to one entering thereon that nothing short of physical impossibility will excuse neglect of a traveler to use his senses of sight and hearing to discover whether a train is dangerously near or not before entering upon such track.

4. In case of a train being in sight and coming towards a highway crossing of a railway track, as a traveler approaches intending to make the crossing, the duty to look and listen and keep out of the pathway of such train is not excused by any regulation as to the legal rate of speed of trains.

5. Assumption as to the speed of a moving train because of a legal regulation may be indulged in when the train is not in sight but not otherwise.

6. Where a person approaching a highway crossing of a railway track has ample opportunity for seeing and keeping out of the pathway of a coming train by exercising the care required of him in respect thereto as matter of law, and nevertheless places himself in such pathway and is killed, leaving no eye-witness of the circumstances thereof, such facts unexplained establish contributory negligence upon the doctrine of *res ipsa loquitur*.

7. Ch. 595, Laws of 1907, as to contributory negligence in certain cases, does not apply to any cause of action existing at the time of its enactment.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Eau Claire county: JAMES O'NEILL, Circuit Judge. *Affirmed.*

Action to recover damages for death of the intestate, claimed to have been caused by actionable negligence of defendant.

Plaintiff's claim was that the deceased, a boy of fourteen years of age, while in the exercise of ordinary care, riding in a cutter with his sister, a school teacher, whom he was taking to her school, the cutter being drawn by a single, gentle horse, journeying on the highway which crossed defendant's track, was, as he entered upon the track, run into by one of defendant's passenger trains, going at a great rate of speed and without giving any signal of its approach by the sounding of the engine bell or blowing of the engine whistle, whereby he was instantly killed. The answer put in issue all allegations as

to defendant's negligence and pleaded contributory negligence.

One of the principal controversies on the evidence was as to whether the deceased, as he approached the railroad crossing, had ample opportunity to see or hear, or both, the approaching train in time to stop his horse and avoid colliding with the train. There was little or no controversy but that he had such opportunity at least from the time he was within 100 feet of the track and that he had such opportunity thereafter continuously until he was at the point of danger, unless his horse escaped from his control after reaching a point sixty-six feet from the track.

The jury rendered the following verdict:

"(1) Was the whistle blown eighty rods from the crossing where the collision occurred?  *A.* No.

"(2) At what rate of speed was the train moving as it approached and passed over the crossing where the collision occurred?  *A.* Forty miles per hour.

"(3) Was the horse running away beyond control from a point about sixty-six feet from the crossing until the collision occurred?  *A.* No.

"(4) If you answer the last question 'Yes,' then was the fact that the horse was so running away beyond control the proximate cause of the accident?  *A.* No.

"(5) Was there failure to exercise ordinary care by the defendant railroad company in the manner in which it managed and conducted the train respecting its speed and whistling as it approached and passed over the crossing where the collision occurred?  *A.* Yes.

"(6) If you answer the last question 'Yes,' then was such failure to exercise ordinary care the proximate cause of the injury and death of Charles B. Clemons?  *A.* Yes.

"(7) Did any want of ordinary care on the part of Charles B. Clemons contribute to produce his injury?  *A.* No.

"(8) In case the court shall be of the opinion that plaintiff is entitled to recover, at what sum do you assess his damages?  *A.* 3,250 dollars."

The court on motion changed the answer to the first question from "No" to "Yes" and made a like change as to the

seventh question, and rendered judgment in favor of the de-
fendant.    Exceptions were duly preserved for consideration
in case of appeal, which was subsequently taken by the plaint-
iff.

W. H. Frawley and T. F. Frawley, for the appellant.

For the respondent there was a brief by James B. Sheean
and Bundy & Wilcox, and oral argument by R. P. Wilcox.

MARSHALL, J.    The first matter presented is: Did the
court err in changing the answer of the jury to the first ques-
tion from the negative to the affirmative?    We pass that as
immaterial because of the conclusions reached respecting
other questions.

The next in order is: Must the answer of the jury to the
third question be understood as finding that the horse was
under control of the deceased while traveling the last sixty-
six feet before reaching the point of collision, so that he might
have stopped and avoided the accident?    That, it seems,
must be answered in the affirmative.    The evidence shows
there was a studied effort by appellant's counsel to bring the
case within the rule of Piper v. C., M. & St. P. R. Co. 77
Wis. 247, 46 N. W. 165, as explained and limited in Guhl v.
Whitcomb, 109 Wis. 69, 85 N. W. 142; Hain v. C., M. & St.
P. R. Co. 135 Wis. 303, 116 N. W. 20; Smith v. C., M. &
St. P. R. Co. 137 Wis. 97, 118 N. W. 638, and similar
cases, that diversion of a driver's attention will not justify
failure to seasonably look and listen at a highway crossing of
a railroad track and to take notice of the dangerous proximity
of a train if one is in plain sight or hearing and avoid getting
in its way, except where the attention is irresistibly forced to
something else so as to deprive such driver of opportunity to
do so.    To do that evidence of a circumstantial character,
there being no direct evidence obtainable, was presented to
maintain that during the sixty-six feet before reaching the
crossing, not momentarily but substantially throughout, the
deceased did not have reasonable opportunity for taking no-

tice of the coming train.    The learned trial court brought to
the attention of the jury all the evidence on the subject.
Near and at the close of the instructions were the words:

"You should not find that the horse was beyond control
and unmanageable if it momentarily shied or jumped.    The
inquiry is whether the horse for substantially this whole space
was in a condition of runaway beyond control."

Facing that, as the jury must have done, there is no escap-
ing the conclusion that they reached the decision that de-
ceased during the space of four rods, the distance across a
common highway, might have stopped, and would have done
so and avoided the collision, had he tried. · We cannot do
violence to the language of question and answer and come to
a different conclusion, as the learned counsel for appellant
would have us do.    These distressing situations draw heavily
upon human sympathy, but with a proper appreciation of ju-
dicial duty and with a proper measure of courage to perform
it they will not incline the mind away from judgment based
on reason.

So we pass to the next question, merely noting on the way
manifest confirmation of the foregoing contained in the
fourth finding, to the effect that the collision between the
horse and the railroad train is not attributable to the horse
being beyond the control of the driver.

Such next question is this: Did the court err in changing
the negative answer as to whether the deceased was guilty of
contributory negligence, to the affirmative?

In considering such question, rightly, we must keep in
view several firmly established legal principles.    First in
order is the one that a conclusion of a trial court, respecting
sufficiency of evidence as to any fact in issue to present a
jury question, should not be disturbed unless it appears from
the record to be clearly wrong, giving due weight to the su-
perior advantages which such court had for discovering the
truth.    *Powell v. Ashland I. & S. Co.* 98 Wis. 35, 73 N. W.
573; *Bohn v. Racine,* 119 Wis. 341, 96 N. W. 813; *Lam Yee*

*v. State,* 132 Wis. 527, 112 N. W. 425.    That valuable principle in the administration of justice is the deciding factor in situations which are doubtful from an examination of the record.    It must be always assumed the trial court paid careful heed to the trial from the beginning until the time of its judgment being invoked as to there being reasonable conflicting inferences from evidence; that he noted the deportment of witnesses and was appreciatively alert to appearances and incidents in the trial, not transferable to the written history thereof, but helpful in arriving at correct judgment. And further he assumed that in reaching the decision the elementary principle was in mind and given due weight, that unless evidence as to an issue is so obviously one way as to leave no room for unbiased minds to reasonably reach a conclusion out of harmony therewith, it is for the jury.    *Powell v. Ashland I. & S. Co., supra.*

Next in order is the principle that a railroad track is such an admonition of danger that he who approaches it at a highway crossing with knowledge thereof, intending to cross the same, must use his senses of sight and hearing to discover whether there is any reasonable probability of his placing himself in dangerous proximity to a moving train if he proceeds; that he is not only bound to look and listen to discover whether a train is dangerously near or not, but is bound to make the discovery of one if there be such plainly visible, or plainly within hearing, and to use his senses in that regard at the last opportunity before going upon the track, and that mere diversion of attention will not excuse nonperformance of these duties.

The rule above stated has been laid down concisely and in unmistakable language many times in recent years, as for instances:

In *Goldmann v. Milwaukee E. R. & L. Co.* 123 Wis. 168, 101 N. W. 385:

"Due care in approaching a railway track can be satisfied only by the full use of the senses of sight and hearing at the

last moment of opportunity before passing the line between
safety and peril."

In *Guhl v. Whitcomb,* 109 Wis. 69, 75, 85 N. W. 142, 144:

"All exception to the duty to look and listen at a railway
crossing resulting from a diversion of attention has been re-
pudiated by this court except in cases where the attention is
so irresistibly forced to something else as to deprive the trav-
eler of the opportunity to perform that duty."

Again in the same case:

"The known presence of a railway track is itself notice of
the momentary peril of a passing train at all times, and the
duty to look and listen is not relaxed by any opportunity for
theorizing or difference of opinion as to whether a train is or
is not likely to pass.   Observation, not logic, is the proper
precaution."

And further in *Marshall v. G. B. & W. R. Co.* 125 Wis.
96, 103 N. W. 250:

"The presence of a railway track is such an admonition of
the probability of danger to one entering thereon, that noth-
ing but physical impossibility will excuse his neglect to use
his senses of sight and hearing to discover whether a train is
dangerously near or not, before so doing.   A person is not
only bound to look and listen for such a train before entering
upon a railway track, but is bound to hear and see one, if
there is such, and reasonable attention to the matter will en-
able him to do so, and if he attempts to cross the track in
violation of such duty or in the face of danger after discover-
ing it, he takes in his own hands the entire responsibility for
what may follow as to injuries to himself, though produced
in part by negligent conduct of the railway trainmen.   One
cannot reasonably expect the law to hold others responsible
for his personal safety, as regards their mere negligence, if
he sees fit to disregard such safety himself."

Next in order is the rule that one in approaching a railway
track is not excused from the duty to look and listen for a
train and to regulate his course accordingly, because of any
regulation as to the speed of trains, nor warranted in acting
upon judgment as to the probability of time it will take such

train to reach the crossing if it is not coming at an excessive rate, in case of its being in sight, and if running at such rate it is likely to reach the crossing before one could safely pass over the same; that one must assume, as within probabilities, that a train may be running at greater than the legal rate. *Schneider v. C., M. & St. P. R. Co.* 99 Wis. 378, 386, 75 N. W. 169; *Vant v. C. & N. W. R. Co.* 101 Wis. 363, 368, 77 N. W. 713; *Goldmann v. Milwaukee E. R. & L. Co.* 123 Wis. 168, 101 N. W. 384.

"Assumptions as to the speed of moving trains in cities may be indulged when they are not in sight, but cannot be relied upon by travelers who have a plain view of the coming train."

A further important principle is this: While contributory negligence must be affirmatively established by the defendant when not disclosed by the plaintiff's evidence, that does not preclude its establishment because of the imperiled person having been killed leaving no eye-witness of the event. The duty to look and listen and to see or hear a train in plain sight or hearing and to keep out of its pathway is such that in case of failure to do so, in absence of evidence to the contrary, a presumption of due care is displaced by the presumption of negligent failure to discover the danger or negligent effort to cross the track in face of danger. *Groesbeck v. C., M. & St. P. R. Co.* 93 Wis. 505, 67 N. W. 1120; *Koester v. C. & N. W. R. Co.* 106 Wis. 460, 82 N. W. 295; *Buckmaster v. C. & N. W. R. Co.* 108 Wis. 353, 357, 84 N. W. 845; *Watermolen v. Fox River E. R. & P. Co.* 110 Wis. 153, 85 N. W. 663; *Ullman v. C. & N. W. R. Co.* 112 Wis. 150, 164, 88 N. W. 41.

Without suggesting that *Winstanley v. C., M. & St. P. R. Co.* 72 Wis. 375, 39 N. W. 856, upon which counsel most rely as to this branch of the case, was, in view of the peculiar facts there disclosed, improperly decided, we may well say in passing that some things said in the opinion are quite out

of harmony with the decisions of this court during the last twenty years, and with rules of law firmly established by such decisions, and we may say, in the same connection, out of harmony with decisions made prior thereto by this court and decisions generally in other jurisdictions.

In *Haetsch v. C. & N. W. R. Co.* 87 Wis. 304, 58 N. W. 393, the facts were so like those in the *Winstanley Case* as to confirm what we have said. The learned justice who wrote the opinion in one wrote the opinion in the other. The facts in the later case were very much like those in the one at hand. Plaintiff relied upon want of any direct evidence as to the conduct of the deceased immediately before the happening of the accident. Speaking to the situation the court said:

"We have these positive and material facts: (1) That the deceased could have seen the train approaching if he had looked, or could have heard it if he had listened, before he came upon the crossing. (2) He came upon the crossing and was killed by the train. (3) The presumption in favor of life is that he came upon the crossing without seeing the train or knowing that it was so near. Therefore, he did not look or listen, and therein he was negligent. If he did look, and saw the train approaching and so near the crossing, and then drove and ran his horse, supposing that he could pass the crossing ahead of the train, as seems quite plausible, he was grossly negligent. These facts, clearly established by the evidence, are conclusive of the want of common care of the deceased that contributed to his death. Under the same circumstances, if a plaintiff should testify in his own case of injury, that he did look and listen before driving upon the crossing, we would say, as the supreme court of Pennsylvania said in *Myers v. B. & O. R. Co.* 150 Pa. St. 386, 24 Atl. 747, 'that it is trifling with justice to permit a jury to find that it is true.' That the deceased did look and did not see the train was a natural and physical impossibility."

It is not infrequent in a case of this sort where death, or unconsciousness terminating in death, was instantaneous, leaving no one to tell how it occurred, that the personal repre-

sentative, pinning his faith to the rule that contributory neg-
ligence must be affirmatively established and absence of di-
rect evidence of the fact in issue, confidently challenges de-
fendant to prove his case and with no less confidence urges
here affirmance or reversal according to his interest, not ap-
preciating that *res ipsa loquitur* applies to such a situation,
when the facts indicate that had the deceased done those
things which he was in duty bound to do or take the risk of
failure, the accident would not have happened, the result
establishes negligence.

The foregoing principle applies with more than ordinary
force in this case in view of the verity that there was nothing
interfering with capacity of the driver to stop his horse at a
safe distance from the track and the fact that the trial judge,
for a better understanding of the evidence, with the jury took
a careful view of the physical situation.

In determining the question of whether the trial court cor-
rectly decided that contributory negligence as matter of law
appeared from the evidence, there seems to be left only the
subsidiary question of whether the presence of the train in
close proximity to the crossing would have been known to the
deceased had he used his senses as he should have done for
that purpose. That he was perfectly familiar with the
crossing and with the fact that he was about on the time for
a train to arrive; that he was driving a gentle horse, not in-
clined to go fast unless urged to do so; that he was rather
above than below the average in intelligence for a boy of his
years; and that he ought to have known and did know of the
dangers incident to crossing a railroad track, appear so satis-
factorily as not to be open to doubt for a moment. He not
only must have known, as indicated, independently of any
special cautionary admonishment, but he was carefully ad-
monished on the subject, as the evidence shows, before start-
ing out on the particular journey. There are these further
unquestionable facts: The railroad track was nearly level

for a distance of over one third of a mile from the crossing in the direction from which the train was coming. There was ample opportunity to turn from the road at a point eighty-one feet from the crossing when the train must have been in plain sight and hearing. The accident happened in the early morning hours. The headlight of the engine was burning as were the lights in the coaches. It was foggy and misty so as to somewhat obscure the rays of the headlight, but the evidence is all one way that it cast its rays over and upon the highway while the deceased was a considerable distance from the crossing, and that the train was plainly visible from the time he was some over 100 feet therefrom until the fatal event occurred. The physical situation in these regards appears from the evidence beyond any manner of doubt, and the finding as to the speed of the train and the evidence of the speed the deceased was going before reaching a point sixty-six feet from the crossing and thereafter shows that at such point the train could not have been more than about 450 feet from the crossing nor more than about 400 feet from him, and that the view was then, as it had been for some fifty feet or more further back, unobstructed in the direction from which the train was coming for some over 2,000 feet. At the particular point the whole train must have been in full view, the rays of the headlight illuminating the crossing and vicinity thereof. The on-rushing train with the engine bell sounding, so short a distance away, with neither wind nor other material interference with the transmission of sound, must have been, on that still January morning, so conspicuous to the eye and so obvious to the ear that its presence must have been known to the deceased had he paid any attention whatever to the matter. Moreover, it is hard to conceive how he could have well avoided knowing of it. Why did he not stop when the slightest regard for his personal safety and that of his sister demanded it? In view of this picture, by no means overdrawn it is thought, and the

undisputed and indisputable finding of the jury as to the
horse being under control, can there be any other rational so-
lution of the matter than that the unfortunate but reckless
boy with his companion challenged the train in a race for the
crossing, resulting in the instantaneous passing of the two
young and valuable lives beyond the impenetrable veil of
eternity? We cannot see any. All the incidents, of which
there are many—we have not related them all,—confirm it
and none throw doubt upon it. The location of the dead
boy and girl, and of the cutter and harness and the condition
of each immediately after the lamentable event, show that the
horse must have reached the near rail at about the instant
the front of the engine passed. The fact that a neighbor
who passed over the crossing shortly before the deceased
reached it, speeded up his horse to get seasonably across,
showing that haste on his part was supposed to be required to
get safely over, and indications that as he speeded his horse
the deceased did likewise, but by reason of difference in the
character of their horses and conveyances the deceased could
not make the time of the one ahead, these and other things
that might be referred to, lead irresistibly to the conclusion
we have reached.

In view of the foregoing stated principles, undisputed evi-
dence, and findings it needs no further discussion to demon-
strate that the trial court's decision must stand. The jury,
on the undisputed evidence as to opportunity for the deceased
to see and hear the approaching train while he was more than
100 feet from the crossing and throughout the entire course
thereafter up to the fatal event, might well have been in-
structed that if they found as to the third question in the
negative to find as to the second in the affirmative.

The result of the submission evidences, in a most striking
way, the importance of the special-verdict law, properly ap-
plied, in the administration of justice. The jury passed
upon the third question, doubtless carefully regardful of all

the evidence bearing thereon. The effect of the finding in the ultimate was to them in obscurity. When they came to the seventh question they appreciated its importance, and doubtless from the best of motives, as regards right in the abstract, but without apprehending clearly legal principles, which the court endeavored to clearly give them, reached a conclusion, which in view of the answer to the third question and the undisputed evidence is indefensible.

"Pity 'tis 'tis true" that in these cases which take such strong hold of human sympathies, juries sometimes, unconsciously probably, are irresistibly so swung away from the safe legal anchorage that they fail to rise to the level required in the discharge of such onerous and important duties. Hence the great importance of the legal effect of each special finding being, for their protection and the ends of justice as well, obscured from their view as much as practicable.

We have now discussed directly, or incidentally, every important matter on this appeal. Much of the brief of counsel for appellant is taken up in discussing minor questions passed upon by the jury adversely to appellant, in deciding major questions, in regard to which their decision is not challenged. Manifestly, we need not heed what is said in that field.

Complaint is made because the court did not permit appellant to introduce evidence of experiments respecting opportunity for seeing a train coming as the one in question did by a person traveling as the deceased traveled. If that were error it was harmless, since the physical situation beyond room for reasonable controversy was as before indicated. Had the witnesses who were tendered testified out of harmony therewith it could not rightly have produced a different result than the one reached. It is a mistake to suppose that such a situation can be thrown into doubt so as to carry the question to a jury by evidence from the mouths of witnesses. Such evidence is not of sufficient weight to turn the scales even from a perfect balance. With an intelligent jury bent

upon performing its duty it tends rather to strengthen than to impair the adversary's case. As suggested in effect in *Haetsch v. C. & N. W. R. Co.* 87 Wis. 304, 58 N. W. 393, it would be trifling with justice to permit a jury to find contrary to the evident physical fact, even if the person imperiled were present to testify and he or any number of witnesses impeached it by their words.

The suggestion is made that the defense of contributory negligence in such a case as this was abrogated by ch. 595, Laws of 1907. It is sufficient to say on that subject that the rights of the parties were fixed before passage of that law. They could not in any event be varied by it. Moreover, there is nothing in the enactment indicating a legislative purpose to make it retroactive. The cases cited by counsel at this point do not have any bearing thereon. Counsel fail to distinguish between rights and mere remedies. This belongs to the former. When rights become vested, having certain characteristics, among them a remedial feature essentially forming a part thereof, not a mere remedy, they cannot be changed even as to such feature without impairing the right itself. The remedial element in such a case is inseparable from the right of which it forms a part and so is under constitutional protection as regards property rights. *Peninsular L. & C. Works v. Union O. & P. Co.* 100 Wis. 488, 76 N. W. 359; *Hammel v. Cairnes,* 129 Wis. 125, 107 N. W. 1089. So the conclusion must be that the judgment complained of is right.

The loss to the surviving relatives by the untimely death of appellant's intestate and his sister and the still greater loss to the public by the destruction of the two young lives must be charged up to offerings on the altar of our modern conditions with its peculiar dangers, its duties, its responsibilities, and its infirmities. Rules of law cannot be changed by the court and adapted to the exigencies of particular cases however distressing they may be. With indifference to results,

except as seriousness thereof may stimulate greater care, established principles must be applied as the infallible test of what is right and what is wrong in the legal aspect. Whether the law as we find it is as we would have it to be if we were permitted to make it, instead of being mere instrumentalities to apply it, is immaterial. Our responsibility begins when we are invoked for its application. It ends when we apply it as we find it. The grade of fidelity with which that duty is performed is to be measured by the vigor and courage with which we labor in our own special field, leaving the responsibility for changing the law to the department of government in which the constitution has lodged it. This is said in passing without purpose to suggest doubt as to whether what is, as regards the law, is right, so far as practicable, from the standpoint of right in the abstract.

*By the Court.*—The judgment is affirmed.